# UNITED STATES DISTRICT COURT

for the
District of Colorado

In the Matter of the Search of:         )   Case No. 20-sw-1256-MEH

INFORMATION ASSOCIATED WITH APPLE ID  )
ACCOUNTS:             )
   (1) carsonfugie@hotmail.com      )
   (2) drogo1498@icloud.com       )
   (3) usalawu@yahoo.com         )
   (4) uasalawu@icloud.com        )
   (5) asha.halverson@gmail.com     )
   (6) peter_mensah100@outlook.com
   (7) boyofash100@outlook.com
THAT ARE STORED AT PREMISES
CONTROLLED BY APPLE, INC.

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that there is now concealed on the following person or property located in the _____ District of ___Colorado and elsewhere___ *(identify the person or describe property to be searched and give its location)*:

**SEE "ATTACHMENT A"**, which is attached to and incorporated in this Application and Affidavit

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:

**SEE "ATTACHMENT B"**, which is attached to and incorporated in this Application and Affidavit

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

    X  evidence of a crime;

    X  contraband, fruits of crime, or other items illegally possessed;

    X  property designed for use, intended for use, or used in committing a crime;

    ☐  a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of 18 U.S.C. §§ 371 (conspiracy), 1343 (wire fraud) and 1956 (money laundering), and the application is based on these facts:

    X  Continued on the attached affidavit, which is incorporated by reference.

    ☐  Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*s/ John P. McGrath*
_____
*Applicant's signature*

Special Agent John P. McGrath, FBI
_____
*Printed name and title*

Sworn to before me and:  ☐ signed in my presence.

                    ☒ submitted, attested to, and acknowledged by reliable electronic means.

Date: 10/21/2020

*Michael E. Hegarty*
_____
*Judge's signature*

City and state:   Denver, CO

Michael E. Hegarty, U.S. Magistrate Judge
_____
*Printed name and title*

## ATTACHMENT A

**Property to Be Searched**

This warrant applies to information associated with the following Apple ID accounts that are stored at premises owned, maintained, controlled, or operated by Apple Inc., a company headquartered at Apple Inc., One Apple Park Way, Cupertino, California, 95014:

    (1) carsonfugie@hotmail.com
    (2) drogo1498@icloud.com
    (3) usalawu@yahoo.com
    (4) uasalawu@icloud.com
    (5) asha.halverson@gmail.com
    (6) peter_mensah100@outlook.com
    (7) boyofash100@outlook.com

1

## ATTACHMENT B

### Particular Things to be Seized

**I.**     **Information to be disclosed by Apple**

To the extent that the information described in Attachment A is within the possession, custody, or control of Apple, regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Apple, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), including on September 22, 2020,September 23, 2020 and October 14, 2020. Apple is required to disclose the following information to the government, in unencrypted form whenever available, for each account or identifier listed in Attachment A:

a.     All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers, email addresses (including primary, alternate, rescue, and notification email addresses, and verification information for each email address), the date on which the account was created, the length of service, the IP address used to register the account, account status, associated devices, methods of connecting, and means and source of payment (including any credit or bank account numbers);

b.     All records or other information regarding the devices associated with, or used in connection with, the account (including all current and past trusted or authorized iOS devices and computers, and any devices used to access Apple services), including serial numbers, Unique Device Identifiers ("UDID"), Advertising Identifiers ("IDFA"), Global Unique Identifiers ("GUID"), Media Access Control ("MAC") addresses, Integrated Circuit Card ID numbers

1

("ICCID"), Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"),

Mobile Equipment Identifiers ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber

Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Numbers

("MSISDN"), International Mobile Subscriber Identities ("IMSI"), and International Mobile

Station Equipment Identities ("IMEI");

      c.     The contents of all emails associated with the account, including stored or

preserved copies of emails sent to and from the account (including all draft emails and deleted

emails), the source and destination addresses associated with each email, the date and time at

which each email was sent, the size and length of each email, and the true and accurate header

information including the actual IP addresses of the sender and the recipient of the emails, and

all attachments;

      d.     The contents of all instant messages associated with the, including stored or

preserved copies of instant messages (including iMessages, SMS messages, and MMS messages)

sent to and from the account (including all draft and deleted messages), the source and

destination account or phone number associated with each instant message, the date and time at

which each instant message was sent, the size and length of each instant message, the actual IP

addresses of the sender and the recipient of each instant message, and the media, if any, attached

to each instant message;

      e.     The contents of all files and other records stored on iCloud, including all iOS

device backups, all Apple and third-party app data, all files and other records related to iCloud

Mail, iCloud Photo Sharing, My Photo Stream, iCloud Photo Library, iCloud Drive, iWork

(including Pages, Numbers, Keynote, and Notes), iCloud Tabs and bookmarks, and iCloud

Keychain, and all address books, contact and buddy lists, notes, reminders, calendar entries, images, videos, voicemails, device settings, and bookmarks;

  f.  All activity, connection, and transactional logs for the account (with associated IP addresses including source port numbers), including FaceTime call invitation logs, messaging and query logs (including iMessage, SMS, and MMS messages), mail logs, iCloud logs, iTunes Store and App Store logs (including purchases, downloads, and updates of Apple and third-party apps), My Apple ID and iForgot logs, sign-on logs for all Apple services, Game Center logs, Find My iPhone and Find My Friends logs, logs associated with web-based access of Apple services (including all associated identifiers), and logs associated with iOS device purchase, activation, and upgrades;

  g.  All records and information regarding locations where the account or devices associated with the account were accessed, including all data stored in connection with Location Services, Find My iPhone, Find My Friends, and Apple Maps;

  h.  All records pertaining to the types of service used;

  i.  All records pertaining to communications between Apple and any person regarding the account, including contacts with support services and records of actions taken; and

  j.  All files, keys, or other information necessary to decrypt any data produced in an encrypted form, when available to Apple (including, but not limited to, the keybag.txt and fileinfolist.txt files).

  Apple is hereby ordered to disclose the above information to the government within fourteen days of issuance of this warrant.

3

## II.      Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and/or instrumentalities of violations of Title 18 United States Code Sections 371 (conspiracy) 1343 (wire fraud) and 1956 (money laundering), including, for each account or identifier listed on Attachment A, information pertaining to the following matters from June 1, 2018 until the present:

a.      Records and information relating to a conspiracy or scheme to defraud individuals;

b.      Records and information related to the transfer and use of proceeds derived from a scheme to defraud individuals;

c.      Any records relating to the persons responsible for or involved in a conspiracy or scheme to defraud, including the individuals: Abriele Fugelberg Kosin, Daro Kosin, Ayodele Fasanya, Adebayo Fasanya, Asha Halverson, Usman Salawu, James Fan Furst, Dioli Guarneri, Andrew Hansen, Christiana Montee, Albert Leonard, and Casper Forbes.  And any records relating to any entities affiliated with the individuals named within this affidavit which include: Full Exposure LLC, QG Autos LLC, Quagmire Global LLC

d.      Any records relating to employees, owners, governors, members, contractors or individuals with any affiliation with Full Exposure LLC, QG Autos LLC, Quagmire Global LLC;

e.      Any records and information related to financial transactions attempted and/or conducted, including but not limited to any and all financial and accounting records, electronic payment transfers, wire transfers, deposits, withdrawals, electronic money transfer applications,

4

cashier's checks, certified funds payments, money order services, safe deposit keys, records of income, payments, expenditures, W-2s, 1099s, other IRS, federal, state or local tax records, payroll records, and similar documents;

f.      Any records related to the Town of Erie, Colorado and Sema Construction;

g.      Records and information relating to the names, addresses, telephone numbers, e-mail addresses, social media accounts and any other user profile of perpetrators, aiders and abettors, and co-conspirators in a conspiracy to defraud individuals;

h.      Any records and information relating to the use or attempted use of online dating websites or online relationship platforms, to include but not limited to Match.com, Zoosk and Singleparent.com;

i.      Any records and information relating to the use or initiation of e-mail accounts, electronic messaging accounts, telephone numbers, and other forms of electronic or digital communication;

j.      Any records and information relating to online and/or electronic accounts utilized to induce and/or request financial transactions;

k.      The identity of the person(s) who created or used the Apple ID, including records that help reveal the whereabouts of such person(s);

l.      Evidence indicating how and when the account was accessed or used, to determine the chronological and geographic context of account access, use and events relating to the crime under investigation and the account subscriber;

m.     Any records pertaining to the means and source of payment for services connected to the Apple accounts (including any credit card or bank account number or digital money transfer account information);

n.     Evidence indicating the subscriber's state of mind as it relates to the crime under investigation; and

o.     Evidence that may identify any co-conspirators or aiders and abettors, including records that help reveal their whereabouts.

**III.**     This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

**IV.**     If the government identifies seized communications to/from an attorney, the investigative team will discontinue review until a filter team of one or more government attorneys and other government personnel, as needed, is established. The filter team will have no previous or future involvement in the investigation of this matter. The filter team will identify and segregate communications to/from attorneys, which may or may not be subject to attorney-client privilege. At no time will the filter team advise the investigative team of the substance of any of the

communications to/from attorneys. The filter team then will provide all communications that do not involve an attorney to the investigative team, and the investigative team may resume its review. If the filter team believes that any of the communications to/from attorneys are not actually privileged (e.g., the communication includes a third party), and if the investigation is not covert, the filter team will first seek to obtain agreement from the appropriate defense counsel before providing these attorney communications to the investigative team.   If consulting with defense counsel is not possible or does not produce an agreement, the filter team will obtain a court order before providing these attorney communications to the investigative team.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

IN THE MATTER OF THE SEARCH OF
INFORMATION ASSOCIATED WITH
APPLE ID ACCOUNTS:
    (1) carsonfugie@hotmail.com
    (2) drogo1498@icloud.com
    (3) usalawu@yahoo.com
    (4) uasalawu@icloud.com
    (5) asha.halverson@gmail.com
    (6) peter_mensah100@outlook.com
    (7) boyofash100@outlook.com
THAT ARE STORED AT PREMISES
CONTROLLED BY APPLE, INC.

Case No. _____

**Filed Under Restriction**

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, John P. McGrath being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Apple Inc. (hereafter "Apple") to disclose to the government records and other information, including the contents of communications, associated with the above-listed Apple ID that is stored at premises owned, maintained, controlled, or operated by Apple, a company headquartered at One Apple Park Way, Cupertino, California, 95014. The information to be disclosed by Apple and searched by the government is described in the following paragraphs and in Attachments A and B.

2.      I am a Special Agent with the Federal Bureau of Investigation (FBI), and have been since August 2010. I'm currently assigned to the FBI Denver, Fort Collins Resident Agency (FCRA) where I have been assigned to investigations dealing with fraud and complex financial

1

crimes. Prior to my assignment at FBI FCRA I was assigned to investigations dealing with corruption of federal, state and local public officials, fraud against the government, drug trafficking organizations, violent street gangs, transnational criminal enterprises and financial institutional fraud. I have participated in court-authorized interceptions of wire communications and have served as both an affiant and a monitor of those interceptions. During my ten (10) years of experience as a law enforcement officer, I have become familiar with the investigative methods and enforcement of federal criminal violations. Based upon this experience, I have also become well versed in the methodology utilized in criminal conspiracies and activities. Additionally, I have arrested numerous individuals for various criminal violations and have spoken with numerous individuals regarding their criminal activities conducted and facilitated through both written and non-written communications. I have authored multiple search warrant affidavits related to the search of communications related to specific Apple ID accounts, email addresses and electronic messages.

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show simply that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.      Based on the facts as set forth in this affidavit, there is probable cause to believe that the information described in Attachment A contains evidence, instrumentalities, and/or fruits of violations of Title 18 United States Code Sections 371 (conspiracy), 1343 (wire fraud) and 1956 (money laundering), as described in Attachment B.

## JURISDICTION

5.      This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A), &

(c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).]  As discussed more fully below, acts or omissions in furtherance of the offenses under investigation occurred within Colorado.

## PROBABLE CAUSE

### Overview of Apple ID Accounts Sought to be Searched and the Accounts' Connections to Persons Involved in the Offenses Under Investigation

6.      This affidavit seeks permission to search seven Apple ID Accounts which are further discussed and identified in detail below.   Based on information produced by Apple in response to a subpoena and consent to search in September of 2020 (specific details provided below in paragraph nos. 91 - 92), the following persons are associated with each of the respective Apple ID Accounts for which information is sought:

| Apple ID Account | Person Associated with Apple ID Account |
|---|---|
| (1) carsonfugie@hotmail.com | Abriele Kosin |
| (2) drogo1498@icloud.com | Trevor Martin (believed by law enforcement agents to be an alias for "Daro Kosin") |
| (3) usalawu@yahoo.com | Khaleed Salawu (believed by law enforcement agents to be an alias for "Usman Salawu") |
| (4) uasalawu@icloud.com | Usman Salawu |
| (5) asha.halverson@gmail.com | Asha Halverson |
| (6) peter_mensah100@outlook.com | Adebayo Fasanya |
| (7) boyofash100@outlook.com | Adebayo Fasanya |

7.      I have determined during my investigation as detailed below, that each of the above individuals participated in and/or worked with others in the criminal offenses under investigation, namely, conspiracy, wire fraud and money laundering.  The specific details of the

3

activity of the above individuals along with their association with and use of the seven Apple ID accounts is explained below.

**Town of Erie Wire Fraud**

8.      On 11/8/19 the Town of Erie Police Department, located in Erie, Colorado, contacted the FBI FCRA with information that the Town of Erie (ERIE) government was a victim of a wire fraud. Previously on 11/5/19 Erie Police Department ("ERIE POLICE") was notified of an alleged fraud that occurred involving ERIE related to an electronic transfer of funds. As part of their initial investigation ERIE POLICE interviewed witnesses and took custody of relevant documents and records that were provided by ERIE and others.

9.      ERIE currently has an agreement with SEMA Construction Inc. ("SEMA"), with offices located in Centennial, Colorado, whereby SEMA is providing construction services for a road and bridge located in Erie, Colorado. Pursuant to their agreement ERIE makes contract progress payments to SEMA. According to employees for both ERIE and SEMA, the contract progress payments were made to SEMA in the form of paper checks.

10.     According to ERIE, on 10/18/19 ERIE Public Works Director approved two contract progress payments to SEMA in the amounts of $615,846.55 and $400,387.25. Per ERIE's practices and procedures, following their respective approvals payments are sent to ERIE accounts payable for the transfer of funds to SEMA or other vendors. Payments are generally processed and submitted for payment on the following Friday, in this instance 10/25/19.

11.     According to ERIE POLICE, on 10/21/19, an unknown subject accessed and submitted to the ERIE website an ERIE Vendor Automated Clearing House (ACH) payment enrollment form ("FORM") containing fraudulent information. FORM was populated with what seemingly appeared to be SEMA vendor information and requested that future ERIE payments to

4

SEMA be made via ACH to a Citibank savings account ending in 3308, in reality not associated

with SEMA. An electronic copy of the fraudulent FORM is provided below:

## Vendor ACH Payment Enrollment Form

Vendor ACH Payment Enrollment Form
*This form is used for Automated Clearing House (ACH) payments to provide
payment related information to your financial institution. You must check with your
financial institution to confirm that funds have been deposited.*

*A **voided check** must accompany this form in order to receive payments
electroincally. A **Social Security Number or Taxpayer ID** is required for vendor
verification. An **email address** is recommended to participate in this program.*

*For more information, please contact JeLynn Jeter at 303-926-2753.*

| | |
|---|---|
| Please Check One of the Following: | Change |
| **Payee / Company Information** | |
| Name: | Sema Construction, Inc. |
| Current Mailing Address: | 7353 S Eagle St, Centennial, CO 80112 |
| Social Security or Taxpayer ID: | 84-1163868 |
| Contact Person Name: | Cameron Mang |
| Work Telephone: | 303-627-2600 |
| Email Address: | cmang@semacoinc.com |
| **Financial Institution Information** | |
| Name: | Citibank |
| Address: | 137 East Arapahoe Rd, Cetennial, CO 80112 |
| Nine-Digit Routing Transit Number: | 266086554 |
| Account Number: | 3200343308 |
| Type of Account: | Checking |

1

5

12.     Accompanying the fraudulent FORM was a copy of a voided check, per the ERIE Vendor ACH Payment Enrollment Form instructions. As such an image of a voided Citibank check bearing account ending in 3308, was electronically attached to the fraudulent ACH Payment Enrollment Form and ultimately submitted to the ERIE website. ERIE accounting specialist J.J. ("JJ"), received and processed the FORM as part of her duties. Based upon later investigation and further detailed below, the check shown in the image was also deemed fraudulent. The image of the voided check was of a Citibank check on Sema Construction, Inc letterhead with two handwritten lines and "void" written on the signature line. The image of the fraudulent, voided check is provided below:



13.     According to JJ, she verified the address, tax identification number, telephone number and contact names that were stated on the FORM by reviewing SEMA's website prior to the funds transfers. JJ did not personally contact SEMA to verify the information provided on FORM nor the individual responsible for submitting the FORM.

14.     Based upon the fraudulent FORM and electronic image of a voided check, ERIE issued two ACH payments in the amounts of $615,846.55 and $400,387.25 on 10/25/2019. The

funds were transferred from ERIE's Citywide bank account and to the Citibank account ending in 3308. Based upon my further investigation and review of additional financial documents, I determined that these funds (i.e. $615,846.55 and $400,387.25) were transferred to the account of an individual identified as WT who lived in Florida. I interviewed WT in approximately February of 2020, and reviewed transactional documents provided by WT, and determined that WT then transferred a substantial portion of such funds to international accounts at the direction of an individual identified as "Casper Forbes". My investigation has continued to attempt to determine the actual identity and location of such person "Casper Forbes" and any connected bank accounts.

15.     Around 11/5/2019 ERIE employees became aware that the progress payments may have been transferred into a suspicious account not belonging to SEMA. JJ contacted SEMA accounts receivable and asked if SEMA received ERIE's progress payments. SEMA stated that they had not received the payments and that their accounts are held at US Bank, not Citibank.

16.     In December 2019 SEMA employees were interviewed by law enforcement regarding the subject fraud. SEMA accounts manager M.B. ("MB"), SEMA Estimator C.M. ("CM") and others were interviewed. MB stated SEMA does not hold any bank accounts at Citibank. MB was contacted by JJ around 11/5/19 and confirmed that SEMA did not receive their progress payments nor did they submit the FORM. As SEMA accounts manager, MB would have been the employee responsible for notifying ERIE of a request of a change in method of payment. MB recalled having telephone conversations with JJ, where JJ asked if SEMA received electronic payment and if SEMA has submitted the FORM. MB instructed JJ that SEMA had not received electronic payment nor did they submit FORM to ERIE. According to MB, SEMA does not have any accounts with Citibank and that the image of the voided check attached to the FORM was

7

fraudulent. SEMA's check software doesn't allow for a SEMA employee to hand-write information onto a paper check. The software requires an employee to electronically populate the required fields for a check, then a printer prints the completed paper check.

17.     MB stated that earlier in 2019 and on at least two occasions her SEMA email account was compromised. An unknown subject(s) attempted to induce SEMA into initiating two wire transfers for what appeared to be business expenses. MB's email account was utilized to send emails that requested that another SEMA employee initiate the fraudulent wire transfers based upon fraudulently created invoices attached to the emails. One wire transfer was initiated by SEMA, but it was ultimately reversed by SEMA's financial institution. The other wire transfer was not initiated based upon the invoice being identified as suspicious by SEMA employees.

18.     CM stated that he did not submit the FORM and in his position at SEMA, accounts receivable issues were not part of his duties. CM stated that the email listed in the FORM, was not his email and not a legitimate SEMA email address. According to CM SEMA employees utilize @semaconstruction.com email addresses, not @semacoinc.

**SEMA email compromise and fraudulently induced wire transfer payment**

19.     Around September 2019 SEMA employee MB's email profile was compromised for a second, known occasion. According to MB, an unknown subject, exchanged emails with SEMA employee accounts clerk A.C. ("AC") and requested that AC facilitate an outgoing payment to a SEMA vendor. The unknown subject, using MB's email, provided AC with an invoice dated 9/27/19, in the amount of $122,760 and payable to a vendor located in Arizona, hereinafter referred to as L.B. LLC ("LB LLC"). Shortly after receiving the fraudulent invoice, AC and other SEMA employees believing the payment request was legitimate and facilitated by

MB, initiated an outgoing wire transfer in the amount of $122,760 payable to the account documented within the fraudulent LB LLC invoice.

20.     After the outgoing wire transfer to LB LLC and around September 30, 2019, SEMA employees realized the LB LLC invoice was fraudulent and contacted their bank to request a funds reversal. SEMA employees, identified the LB LLC invoice as being fraudulent after receiving a second fraudulent vendor invoice, sent from MB's compromised email account, requesting payment to an international based bank account. AC and MB had a conversation in which MB stated that she did not send AB an email requesting a vendor payment payable to an international account. AB subsequently reviewed the second invoice and the LB LLC invoice and noticed suspicious similarities. Based on SEMA's request, the $122,760 wire transfer was ultimately reversed and the funds were returned to SEMA.

21.     In June 2020 the sole signer of the LB LLC bank account, hereinafter referred to as L.B. ("LB") was interviewed by law enforcement. LB stated that she began an online relationship (while using the online site Singleparent.com) with an unknown subject utilizing the alias CHRISTINA MONTEE in 2019 and eventually became victim to an online romance scam. MONTEE claimed that she was in France taking care of an elderly relative and intended to return to the United States to marry LB. Around September 2019 MONTEE asked if she could have an inheritance payment deposited into LB's account. MONTEE explained that the funds would go towards purchasing a vehicle and other expenses upon returning to the United States. LB agreed and around 9/27/19, a $122,760 deposit was made into LB's personal bank account. Shortly after the deposit was made, MONTEE asked LB to obtain a $61,500 certified check made payable FULL EXPOSURE LLC and have it deposited into FULL EXPOSURE LLC's Chase bank account located in Utah. MONTEE provided LB with FULL EXPOSURE LLC's Chase bank

account information and explained that the business was her deceased grandfather's construction company.

22.     Around 9/30/2019, LB obtained a $61,500 certified check payable to FULL EXPOSURE LLC using the funds MONTEE had deposited into her personal bank account.  LB later traveled to a Chase bank branch and deposited the certified check into FULL EXPOSURE LLC Chase account 3581. Later LB was contacted by an employee from LB's bank that instructed her that the funds MONTEE had deposited were fraudulent. LB telephonically confronted MONTEE about the fraudulent deposit, in which MONTEE denied the nature of the funds. Shortly after September 30, 2019, LB terminated all communications with MONTEE.

## FULL EXPOSURE LLC and the KOSINS

23.     According to the State of Utah Division of Corporations, FULL EXPOSURE LLC (FULL EXPOSURE) is a business with an address at 50 West. Broadway Suite 333 #74820, Salt Lake City, Utah 84101. The business was registered with the State of Utah on April 16, 2019.

24.     According to federal grand jury subpoena production records obtained from Chase bank, ABRIELE JORDYN KOSIN (ABRIELE) was the sole signer for two FULL EXPOSURE business accounts, account numbers ending in 3581 and 1597, with a business title of "member" and address of 7845 S. Candlestick Lane, Apartment 5305, Midvale, Utah 84047.  Both accounts were opened on May 4, 2019 by ABRIELE. ABRIELE's telephone number was listed as being (208) 520-0715. Based on Chase records FULL EXPOSURE's business description and services provided as being "photograph advertising portfolios for salon businesses and individuals" with a telephone number of (208) 716-4539. A note placed within the two FULL EXPOSURE signature cards dated May 4, 2019, designated DARO KOSIN (DARO) as a "signer(s) to be added later."

Around January 9, 2020, Chase compliance requested the closure of FULL EXPOSURE account

on March 8, 2020 and noted that no new accounts could be opened.

25.     ABRIELE also held a personal checking account at Chase, account number ending

in 9026. ABRIELE was the sole signer and opened the account on January 20, 2019. The account

was closed by Chase compliance around October 15, 2019.

26.     According to federal grand jury subpoena production records obtained from Wells

Fargo Bank, ABRIELE held a personal checking account, account number ending in 0545 and a

FULL EXPOSURE business checking account, account number ending in 4993. ABRIELE was

the sole signer for both her personal and the FULL EXPOSURE accounts. ABRIELE opened her

personal account on December 22, 2018 and the FULL EXPOSURE account on May 4, 2019.

ABRIELE's personal account was closed by Wells Fargo around November 29, 2019 and the

FULL EXPOSURE account was closed on November 14, 2019.

27.     At the time she opened her personal account, ABRIELE provided Wells Fargo

with a residential address of 7845 S. Candlestick Lane, Apartment 5305, Midvale, Utah 84047

and her current employer as Intermountain Health Care. According to account opening

documents, FULL EXPOSURE was established on April 16, 2019, business industry was

"Information/Media" and the description of business was provided as "media advertising."

28.     According to a law enforcement interview of ABRIELE on March 12, 2020, at her

residence located at 4939 South Lake Pines Drive, Apartment 8C, Murray, Utah. ABRIELE stated

that she is married to DARO, a Nigerian citizen, and that they both had previously operated

FULL EXPOSURE. ABRIELE claimed FULL EXPOSURE was a media marketing company and

indicated that it was no longer an active company. According to ABRIELE, FULL EXPOSURE

maintained an address in a downtown Salt Lake City office building to receive mail, but never

11

had an office physically located there. ABRIELE and DARO recently moved into their current apartment and agreed to a one year lease. ABRIELE and DARO met while attending college at Brigham Young University- Idaho.

29.     Based upon a May 2020 immigration query, DARO was not in the United States legally.

30.     Based on records obtained from KeyBank, DARO opened a bank account ending in 4433 in May 2017. DARO listed his date of birth as July 26, 1997, and place of employment as "BYUI Student," which law enforcement interprets to mean that DARO was a student at Brigham Young University- Idaho. On February 8, 2019, DARO deposited a $72,000.68 check into his 4433 account. Later on February 12, 2019, Keybank withdrew the funds from DARO's account as a chargeback, as a result of the check being counterfeit. According to Keybank the counterfeit check did not consist of a check number nor listed maker information and was drawn from a frozen account. On February 13, 2019, Keybank interviewed DARO, in which DARO claimed that he received the check from an individual that was purchasing land from DARO, which was located in Nigeria.  Also on February 13, 2019, DARO completed a Keybank affidavit in which he stated his telephone number as being (208) 716-4539. As a result of Keybank's investigation they closed DARO's 4433 account on February 22, 2019.

31.     According to information obtained from the ABRILE and DARO's former property management company located at 7840 South Candlestick Lane, Midvale, Utah, ABRIELE and DARO were both named on their rental agreement as utilizing telephone numbers (208) 520-0715 and (208) 716-4539. At the time of the interview the property manager stated that ABRIELE and DARO recently vacated 7845 South Candlestick Lane, Apartment 5305, Midvale,

Utah 84047 and provided a forwarding address of 4939 South Lake Pines Drive, apartment 8C, Murray, Utah.

32.     Based upon a review of the Chase records, approximately thirty-four cash deposits totaling in excess of $104,000 were deposited into ABRIELE's checking account and /or the two FULL EXPOSURE accounts from January 2019 through December 2019.

33.     Based on a review of the ABRIELE and the FULL EXPSOURE Chase accounts she obtained three payments in 2019 that law enforcement believes to be related to her employment. Two payments were made by The Fountain Group totaling approximately $1,703.85 and one payment from Great Resort Vacations LLP for approximately $183.40.

34.     A State of Utah Department of Labor query for ABRIELE confirmed employment records in 2019 and/or 2020 for The Fountain Group and Great Resort Vacations LLP. A State of Utah Department of Labor query for DARO revealed that DARO did not receive wages in 2019 nor early 2020 from any employer. Neither ABRIELE nor DARO had any State of Utah employment or wage records affiliated with FULL EXPOSURE.

35.     Based upon Verizon records obtained in July 2020, both telephone numbers (208) 520-0715 and (208) 716-4539 had been assigned to Apple iPhone devices.

### QG AUTOS, QUAGMIRE GLOBAL and USMAN SALAWU

36.     According to a query of the State of Georgia Corporations Divisions, QG AUTOS LLC's (QGAUTOS) registered agent is USMAN SALAWU with an office address of 2759 Delk Road SE Suite 2310, Marietta, GA 30067. A further search within the State of George Corporations Division revealed that SALAWU is the registered agent for ELISIO PROPERTIES LLC, office address 25 Terminus Place, Unit C 3527, Atlanta, GA 30305.

37.    According to a review of SALAWU's LinkedIn profile he is the Chief Executive Officer of QGAUTOS, the founder of QUAGMIRE GLOBAL LLC (QUAGMIRE) and a partner in ELISIO PROPERTIES. A review of the LinkedIn profile detailed that QUAGMIRE GLOBAL LLC is an offshoot of QUAGMIRE GLOBAL CONCEPT, a Nigerian affiliated company.

38.    According to law enforcement and immigration records, SALAWU was born in Nigeria and as of May 2020, SALAWU's immigration status revealed him being a conditional permanent resident of the United States.

39.    Based upon bank records, QG AUTOS LLC had one account at Synovus Bank with an account number ending in 7598.  The account was opened on February 21, 2019, by sole member, USMAN SALAWU, date of birth October 9, 1984, business address of 2759 Delk Road SE Suite 2310, Marietta, GA 30067 and telephone number 404-951-9446.

40.    According to bank records, a Synovus employee spoke with SALAWU on November 1, 2019, in which he stated that QGAUTOS purchases cars and ships them to individuals that he provides with invoices, emails, etc.

41.    Based on a review of Synovus Bank records, on November 1, 2019, Chase sent wire recalls for three wires that were deposited into the QGAUTOS Synovus account. The three wires came from two entities and totaled $224,621. The final transaction within the account was a check made payable to Chase for $218,068.96 so they could refund the two entities their money. Subsequently on November 21, 2019, the Synovus Bank Fraud Department closed the QGAUTOS account due to "fraud."

42.    QGAUTOS Synovus account received four deposits from FULL EXPOSURE that totaled $57,425 between August and September 2019.

14

43.     QGAUTOS made a $4,000 payment to AYODELE FASANYA on October 7, 2019, via official check. Later on October 15, 2019, QUAGMIRE, from a SunTrust bank account, made an $18,000 payment to AYODELE FASANYA via official check.  Both payments were deposited into AYODELE FASANYA's Chase account ending in 0091. Using the funds from the QUAGMIRE payment, AYODELE FASANYA withdrew $6,000 on October 18, 2019 and made three payments, two via Zelle to ADEBAYO FASANYA and one via Cash app to "Bayo," who law enforcement believes to be ADEBAYO FASANYA, totaling $5,000 on October 21, 2019.

44.     A July 2020 State of Georgia Department of Labor query of SALAWU, QGAUTOS and QUAGMIRE yielded negative results, meaning that no information existed within their database.

45.     According to T-Mobile records obtained in July 2020, SALAWU, date of birth August 9, 1984, address 25 Terminus Place, Unit 3527, Atlanta, GA 30305 has been assigned telephone number 404-951-9446 since October 2016.

### ADEBAYO aka "Bayo" FASANYA and AYODELE FASANYA

46.     According to immigration records both ADEBAYO FASANYA (ADEBAYO), date of birth September 18, 1986, and AYODELE FASANYA (AYODELE), date of birth July 28, 1987, are Nigerian nationals. Based upon a May 2020 immigration query, ADEBAYO was not residing in the United States legally and AYODELE had a pending United States immigration application.

47.     According to Idaho Department of Motor vehicle records both ADEBAYO and AYODELE have a residential address of 2703 E. Bernice Drive, Meridian, Idaho 83646. According to Wells Fargo bank records, ADEBAYO utilizes both the aforementioned Meridian, Idaho address as well as 1390 Northside Drive Northwest, Apartment 2324, Atlanta, GA 30318.

According to 2019 Chase bank records, AYODELE was associated with both 6035 Baywind Place, Apartment L, Indianapolis, IN 46224 and later 1390 Northside Drive Northwest, Apartment 2324, Atlanta, GA 30318. According to bank and open source records ADEBAYO is associated with telephone numbers (208) 514-4989 and (208) 389-8414. According to bank records AYODELE is associated with telephone number (208) 801-9039.

48.     In September 2020 ADEBYAO was arrested in Indianapolis, Indiana and charged by local authorities with multiple counts of false government identification, multiple counts of counterfeiting and identity deception. An Apple iPhone device was seized by law enforcement at the time of ADEBAYO' arrest. ADEBAYO instructed law enforcement that the telephone number assigned to the device was (424) 499-7333. According to a subsequent consent search of the device, law enforcement identified the device as being an iPhone 11 device and associated with Apple IDs peter_mensah100@outlook.com and boyofash100@outlook.com.

49.     A review of the ABRIELE and FULL EXPOSURE Chase accounts indicated that no less than $93,732 was transferred to ADEBAYO and AYODELE.  More specifically transfers from ABRIELE and/or FULL EXPOSURE Chase accounts totaling approximately $38,912 were made deposited into ADEBAYO's accounts and transfers totaling approximately $54,820 were deposited into AYODELE's accounts.

50.     According to bank records there were three payments totaling approximately $38,912 received by ADEBYAO, that consisted of an $8,923.00 cashier's check paid on December 26, 2019, a $10,989.00 wire was sent on December 30, 2019, and a $19,000 cashier's check on March 6, 2020. There were also nineteen payments totaling approximately $17,480 to an individual listed as "Bayo" using the Cash App and Square. Based on a review of bank records,

law enforcement believes "Bayo" to be ADEBAYO as no other individuals were identified with the name "Bayo" or a name partially consisting of "Bayo."

51.     According to bank records there were thirteen payments totaling approximately $77,468 transferred from ABRIELE and/or FULL EXPOSURE Chase accounts to AYODELE, including a $40,000 wire on February 28, 2019 a $9,600 on March 22, 2019, and a $5,220 wire also on March 22, 2019. Of the remaining ten payments, six were made from the Cash App that list an individual named "Ayodele". Based on a review of bank records, law enforcement believes "Ayodele" to be AYODELE as no other individuals were identified with that name.

52.     An August 2020 State of Idaho Department of Labor query of ADEBAYO and AYODELE yielded negative results, meaning that no information existed within their database. A July 2020 State of Georgia Department of Labor query of AYODELE yielded negative results, meaning that no information existed within their database.

## ASHA HALVERSON

53.     Chase bank records for ASHA MARI HALVERSON (HALVERSON), revealed HALVERSON opened a checking account ending in 3139 as well as an account ending in 7778. Account 7778 was opened by HALVERSON on January 7, 2019. Those records also revealed HAVLERSON's date of birth as being April, 20, 1999, residential address of 3232 S 2600 E, Millcreek, Utah 84109 and associated with telephone number (801)819-2034. According to Apple records obtained in September 2020, HALVERSON is associated with telephone number (801) 819-5888.

54.     A review of HALVERSON's Chase records revealed suspicious deposits and subsequent transfers of the suspicious funds to co-conspirators ABRIELE, AYODELE and

ADEBAYO. Law enforcement identified similar banking patterns conducted by HALVERSON to those of FULL EXPOSURE, ABRIELE, AYODELE and ADEBAYO's laundering of fraud proceeds.

55.     An example of this was revealed following a February 19, 2019 incoming wire transfer of $10,000 deposited to HALVERSON's Chase account 7778. Following the deposit and between the dates of February 19, 2019 and February 21, 2019, HAVLERSON's account transfers $460 via Zelle payments to ABRIELE and $9,275 to AYODELE via Zelle payment and a wire transfer.

56.     Another example of occurred around March 1, 2019 following a $1,600 money order deposit into HAVLERSON's Chase account 7778. Following the deposit and on March 4, 2019, HALVERSON's account transferred $1,600 to ABRIELE via Zelle payment.

57.     A review of HALVERSON's Chase account 7778 between January 2019 and November 2019 revealed frequent payroll checks that routinely deposited into the account. Those payroll checks were in amounts less than $1,000 with the majority of checks in amounts less than $500. Outside the February 19, 2019 to February 21, 2019 and the March 1, 2019 to March 4, 2019 timeframes, in which the suspicious deposits were made and funds subsequently transferred to ABRIELE and/or AYODELE, HAVLERSON's account balance never exceeded $1,000. Based on the forgoing law enforcement believes that both the $10,000 wire transfer and $1,600 money orders that were deposited and disbursed to ABRIELE and/or AYODELE were in furtherance of a money laundering scheme.

**Fraud proceeds facilitated thru FULL EXPOSURE and ABRIELE's Chase accounts**

58.     A review of Chase records for ABRIELE and FULL EXPOSURE identified several transactions that law enforcement believes to be indicative of fraud and money laundering,

18

in which the proceeds were utilized to financially benefit the KOSINs as well as their co-conspirators.

## February 2019 GN Romance Fraud

59.     Based on a review of bank records, on February 27, 2019, ABRIELE's Chase 9026 account received an incoming wire deposit in the amount of $49,930 from G.N. ("GN"). The incoming wire transfer consisted of a note that stated "Deposit on condo." On February 28, 2019, an outgoing wire from ABRIELE's Chase 9026 account in the amount of $40,000 was transferred to Chase account number ending in 0091 belonging to AYODELE. Between the dates of February 28, 2019 and March 1, 2019, ABRIELE withdrew $7,080 from her account.

60.     Following the February 28, 2019, $40,000 incoming wire transfer from ABRIELE, AYODELE withdrew $36,900 between the dates of February 28, 2019 and March 8, 2019. On March 4, 2019, AYODELE made an electronic payment of $900 to "bayo," who law enforcement believes to be ADEBAYO.

61.     Law enforcement believes based upon the division of the fraud proceeds amongst known co-conspirators and that the proceeds were not directly utilized for a deposit on a condo purchase that the wire transfer proceeds from GN into ABRIELE's account were fraudulent and subsequently laundered to other co-conspirators.

## March 2019 SP Romance Fraud

62.     Based upon a review of bank records, on March 20, 2019, two separate $9,000 incoming wire transfers were deposited into ABRIELE's Chase account 9026 from S.P. ("SP"). Both wire transfers consisted of notes that stated "Funds for James Fan Furst in Beijing." Between March 21, 2019 and March 22, 2019, ABRIELE transferred three payments, two wire transfers and one Zelle payment, totaling $16,820 to AYODELE's Chase account 0091. Included

in the wire transfer payments to AYODELE were comments, "Happy birthday love" and "Rent." As stated earlier AYODELE's birthdate is July 28, 1987, and according to her 2019 bank account records associated with addresses in Indianapolis, IN and Atlanta, GA not in Utah. Law enforcement believes the comments made in the wire transfers to AYODELE to be false and further utilized to conceal the fraudulent activity.

63.     Following the third transfer that totaled $16,820 from ABRIELE on March 22, 2019, AYODELE withdrew $14,500 between the dates of March 22, 2019 and March 23, 2019. On March 22, 2019, AYODELE made two Zelle payments totaling $600 to ADEBAYO and one $500 electronic transfer on March 25, 2019 to "bayo," who law enforcement believes to be ADEBAYO.

64.     Based upon a July 2020 law enforcement interview of SP, SP stated that she was a victim of an online romance scam and as a result wired a total of $18,000, two $9,000 wire transfers, on behalf of online alias James Fan Furst, to a bank account located in Utah. The online alias advised SP that he needed financial assistance as his passport was seized by Chinese customs officials. The online alias further claimed that the most convenient method of having his passport released was for SP to wire funds to the FULL EXPOSURE bank account located in Utah. After sending the two wire transfers and based on the nature of their communications, SP realized that she had been defrauded.   SP advised that the online site dating site she used was "Match.com".

**August 2019 RB Fraud**

65.     Based upon a review of records, FULL EXPOSURE account 3581 received three deposits totaling $60,000 between August 13, 2019 and August 28, 2019, from R.B. ("RB"). Using those deposits and on August 14, 2019, an ATM withdrawal was made in the amount of

$2,000. Between August 21, 2019 and August 28, 2019, five Zelle payments totaling $8,960 were made to ABRIELE. Between August 21, 2019 and August 23, 2019, two "Cash App" payments totaling $3,960 were made to DARO.

66.     On August 16, 2019, and following the initial $15,000 deposit from RB, an outgoing wire transfer in the amount of $12,000 was transferred into QGAUTOS Synovus Bank account 7598. Later on August 16, 2019, QGAUTOS made a $6,785 withdrawal. On August 23, 2019, and following a second $15,000 deposit from RB, an outgoing wire transfer in the amount of $10,975 was transferred into the same QGAUTOS Synovus Bank account. On August 29, 2019, and following the final deposit of $30,000 from RB, an outgoing wire transfer in the amount of $26,975 was deposited into the same QGAUTOS Synovus Bank account. Between the dates of August 22, 2019 and August 28, 2019 QGAUTOS made three withdrawals totaling $29,021.[1]

67.     Based upon an October 2020 law enforcement interview of RB, RB stated that he was a victim of an online romance scam and as a result wired multiple payments to a Chase bank account, on behalf of online alias Albert Leonard. The online alias advised RB that he needed financial assistance related to his construction project located and Kuwait. Later the online alias stated that he was arrested and needed financial assistance to bond out of jail as well as pay for his food expense while in custody.

---

[1] On 8/20/19 QGAUTOS Synovus account obtained three incoming wire transfers totaling $22,575 from Tiffany Roundy. Later in October 2019 QGAUTOS received a $36,965 incoming wire transfer from Tiffany Roundy that was recalled to Chase bank and was identified as part of a "fraud" that led Synovus Bank to close QGAUTOS account in November 2019. On 8/28/19 QGAUTOS Synovus account received a cash deposit of $7,000.

**September 2019 MV Romance Fraud**

68.     On September 19, 2019, one $10,000 incoming wire transfer was deposited into

FULL EXPOSURE account 3581 from M.V. ("MV"). The wire transfer consisted of a note that

stated "For Andy." Later on September 19, 2019 and continuing through September 23, 2019,

three outgoing payments totaling $1,490 were made to ABRIELE via Zelle. On September 23,

2019, one outgoing wire transfer in the amount of $7,475 was transferred into QGAUTOS

Synovus bank account number 7598.  On September 25, 2019 a $7,207 withdrawal was made

from the QGAGUTOS Synovus account.

69.     Based upon a July 2020 law enforcement interview of MV, MV stated that the

$10,000 wire transfer payment was for Andrew Hansen, whom MV met on an online dating

website "Zoosk" around June 2019. To date MV has never met Hansen in person nor conducted a

video conference, such as Facetime or Skype, with Hansen to corroborate his alleged identity.

Hansen claimed that customs authorities in England seized solar panels that were shipped from

China on behalf of Hansen's business. Hansen asked and MV agreed to pay a customs fine so that

Hansen could take possession the solar panels. Hansen directed MV to wire the funds to the

FULL EXPOSURE bank account located in Utah. Hansen claimed that the FULL EXPOSURE

account belonged to the England based customs official responsible for releasing the solar panels.

70.     During the course of their communications Hansen provided MV with a

photograph of a United States passport claiming to belong to him. Based upon a United States

Department of State review of the passport number, law enforcement was able to determine that

Hansen's passport was fraudulent. Based upon the nature of their relationship, conversations,

information provided to MV and utilization of the FULL EXPOSURE account, law enforcement

22

believes that Hansen is an online alias being utilized to fraudulently obtain money from MV and possibly others.

### November 2019 transfers between FULL EXPOSURE, AYODELE and ADEBAYO

71.     Based upon a review of bank records, between November 15, 2019 and November 19, 2019, four cash deposits were made into FULL EXPOSURE account 3581 that totaled $15,300. Between November 18, 2019 and November 25, 2019, using the aforementioned deposits, four Cash App payments totaling $6,900 were made to "Bayo" who law enforcement believes to be ADEBAYO. Between November 27, 2019 and November 29, 2019, using the aforementioned deposit funds, two Cash App payments totaling $4,500 were made to "Ayodele," who law enforcement believes to be AYODELE. On November 25, 2019, a $1,000 ATM withdrawal was made using the funds from the deposits. Also in the same timeframe and using the aforementioned deposits, two Cash App payments totaling $2,135 were made to "Trevor." Due to the nature of the cash deposits, law enforcement has not yet obtained the source of the cash. Based upon the common pattern of funds deposited into the FULL EXPOSURE account with no apparent legitimate nor business purpose and being utilized for outgoing payments to co-conspirators, law enforcement believes the nature of the cash deposits to be fraudulent.

### February 2020 Suspicious Wilson Consulting Deposit

72.     Based upon a review of bank records, on February 26, 2020, a $41,536 check was deposited into FULL EXPOSURE account 3581 from "Wilson Consultanting Co." The memo line on the check stated "RE Payment" and the appeared to be signed by "C. Wilson." Later on March 6, 2020, a $19,000 cashier's check made payable to ADEBAYO was obtained using funds from the deposited check.  Also March 6, 2020, ABRIELE obtained a cashier's check made payable to Miller Estates using funds from the check. An open source search of Miller Estates

23

revealed an apartment complex located at ABRIELE and DARO's residential address in Murray, Utah. Between March 6, 2020 and March 10, 2020, ABRIELE made $17,100 in withdrawals from FULL EXPOSURE Account 3581 payable to herself. Also on March 10, 2020, ABRIELE withdrew an additional $1,544.08 using from FULL EXPOSURE Account 3581.

73.     Based upon the forgoing and that the check proceeds were divided between known co-conspirator ADEBYAO and otherwise withdrawn and utilized by ABRIELE for no apparent legitimate purpose, law enforcement believes that the check's proceeds were a result of a fraud.

**March 2020 Fraudulent DC LLC Check Deposit**

74.     Based upon a review of bank records, on March 2, 2020, a $136,830 check was deposited into FULL EXPOSURE account 3581 from "DC LLC." The check appeared to be signed by an employee C.H. ("CH"). Later on March 5, 2020, the funds from the check were returned and Chase made a note of the check being "altered/fictiti."

75.     Based upon an August 2020 law enforcement interview of DC LLC employee T.M. ("TM"), the fraudulent check made payable to FULL EXPOSURE was identified and rejected for payment, utilizing a banking security feature, by a DC LLC employee. Since early 2019 several DC LLC fraudulent checks have attempted to be deposited by various individuals and entities. According to TM the fraudulent checks had to have been created, as no legitimate checks existed for the DC LLC bank account documented on the fraudulent checks.

**FULL EXPOSURE and ABRIELE's Wells Fargo account activity**

76.     Based on a review of the FULL EXPOSURE Wells Fargo account, law enforcement observed similar transaction activity within the Wells Fargo account as the deposits and distribution of fraud proceeds within ABRIELE's and FULL EXPOSURE's Chase bank accounts discussed earlier within this affidavit.

24

77.     Based on a review of the FULL EXPOSURE Wells Fargo account and following the initial $200 cash deposit into the account, there were approximately eight cash deposits totaling $27,800. Those eight cash deposits were made between August 29, 2019 and September 26, 2019.  The $27,800 in cash deposits were utilized to distribute $26,667 to co-conspirators between the dates of August 29, 2019 and September 20, 2019.

78.     The aforementioned deposits were used to transfer $4,585 into ABRIELE's Wells Fargo personal account as well as make two withdrawals totaling $11,000. Additionally the FULL EXPOSURE deposits were further utilized to make two Cash App payments totaling $4,550 made to "bayo" who law enforcement believes to be ADEBAYO. The FULL EXPOSURE deposits were further utilized to make three Cash App payments totaling $6,532 made to "ayodele" who law enforcement believes to be AYODELE FASANYA.

79.     Based upon an analysis of the FULL EXPOSURE Wells Fargo account prior to the aforementioned deposit on August 29, 2019, only $620 had been transferred into the FULL EXPOSURE account. Those funds were deposited from ABRIELE's personal Wells Fargo account. Law enforcement believes to the deposits were utilized to maintain a positive account balance and offset various non-suspicious debits. Following the final deposit on September 26, 2019, approximately $64 had been transferred into the FULL EXPOSURE account from ABRIELE's personal Wells Fargo account, for what law enforcement believes to have been utilized to maintain a positive account balance and offset various non-suspicious debits.

80.     Based upon the forgoing law enforcement believes that the FULL EXPOSURE Wells Fargo account was primarily utilized to obtain $27,000 in suspicious deposits and to facilitate proceeds to co-conspirators. Once the proceeds were transferred into possession of ABRIELE, AYODELE and ADEBAYO  the account activity only consisted of three debits

25

related to bank fees and ABRIELE's minimal transfers to seemingly maintain a positive account balance prior to closing the account on November 14, 2019.

81.    Based on a review of the ABRIELE's Wells Fargo account, law enforcement observed similar transaction activity within the Wells Fargo account as the deposits and distribution of fraud proceeds within the ABRIELE and FULL EXPOSURE Chase bank accounts discussed earlier within this affidavit.

82.    Between January 11, 2019 and October 18, 2019, approximately $128,990 in deposits, not directly attributable to ABRIELE nor FULL EXPOSURE, were made into the account. The deposits consisted of approximately $104,550 in checks made payable to ABRIELE from various individuals, $5,200 in money orders, $3,500 in Zelle payments from Tiffany Belle Roundy[2] and $15,741 in deposits in which the source is unknown. The aforementioned deposits, in which the source could be determined, were not made by any entity or business revealed in a State of Utah Department of Labor query for ABRIELE.

83.    Between January 11, 2019 and October 15, 2019 ABRIELE made withdrawals in the amount of approximately $44,582 from her Wells Fargo account. Between January 11, 2019 and October 15, 2019, ABRIELE's Wells Fargo account transferred approximately $31,850 to accounts believed to be utilized by AYODELE, $11,705 to accounts believed to be utilized by ADEBAYO, $5,590 to accounts believed to be utilized by DARO and $13,705 to an accounts utilized by "Trevor."

---

[2] Tiffany Belle Roundy was introduced in an earlier footnote which stated that on 8/20/19 QGAUTOS Synovus account obtained three incoming wire transfers totaling $22,575 from Tiffany Roundy. Later in October 2019 QGAUTOS received a $36,965 incoming wire transfer from Tiffany Roundy that was recalled to Chase bank and was identified as part of a "fraud" that led Synovus Bank to close QGAUTOS account in November 2019.

**Romance Scam Proceeds into ABRIELE and HALVERSON's accounts**

84.     Based on a review of ABRIELE's Wells Fargo account, the second deposit into her account was a $13,500 cashier's check from D.L ("DL") on January 11, 2019. Using those funds and between January 23, 2019 and January 25, 2019 ABRIELE withdrew $8,500, made a $500 transfer to DARO with a note of "rent" and sent a $4,470 wire transfer to Icebox Inc Atlanta, GA with details that stated "wrist watch and jewelry." An open source search of Icebox Inc in Atlanta, GA yielded a website www.icebox.com that stated the company is a jewelry company located in Atlanta, GA.

85.     Based upon a September 2020 law enforcement interview of D.L. ("DL"), DL met an individual claiming to be Dioli Guarneri[3] on an online dating website around June 2018. After a period of time Guarneri asked that DL make business loan payments on Guarneri's behalf as he claimed to be working outside of the country and didn't have the funds to repay his lenders. Guarneri claimed that he would be paid $2.5M upon completion of his architecture project located in South Africa and could reimburse DL at that time. Between October 2018 and March 2019 DL made multiple payments to individuals that Guarneri claimed to be lenders.

86.     DL confirmed that the $25,000 cashier's check dated November 23, 2018 and the $30,000 cashier's check dated December 21, 2018 both made payable to HAVLERSON were for loan payments on behalf of Guarneri. A review of the two cashier's checks provided by DL's bank revealed that both checks were deposited into a Chase bank account. Law enforcement requested additional records to corroborate the account the cashier's checks were deposited into.

---

[3] According to FBI IC3 complaints received in June 2018 and May 2019, online alias Dulio Guarneri defrauded and/or attempted to defraud two female victims in an apparent online romance scheme.

87.    DL confirmed that the $13,500 cashier's check deposited into ABRIELE's account on January 11, 2019, was for a loan payment on behalf of Guarneri.

88.    Around March 2019 and following conversations with DL's bank, DL realized that she had been defrauded of approximately $144,000 through an online romance scheme. Based upon information provided by DL and prior victim SP, law enforcement was able to identify similar patterns and statements made by both online aliases that victimized both DL and SP. The online aliases provided similar biographical information as well as employment details to both DL and SP in the course of their communications prior to requesting financial assistance.

89.    Based upon the forgoing, law enforcement believes there is probable cause that bank accounts controlled by ABRIELE were utilized to obtain fraud proceeds directly from multiple victims and distribute them to other accounts controlled by ABRIELE, DARO, SALAWU, AYODELE and ADEBAYO. Further the fraud proceeds obtained by the conspirators appeared to be withdrawn from accounts for personal use, as there is no evidence that the withdrawals went toward nor were intended for a legitimate purpose.

## APPLE DEVICES AND ACCOUNTS

90.    According to Verizon telephone records obtained in September 2020, telephone numbers 208-716-4539, associated with DARO and FULL EXPOSURE, was assigned to an Apple iPhone XS and telephone number 208-520-0715, associated with ABRIELE, was assigned to an Apple iPhone 8.

91.    As stated earlier, ADEBAYO was arrested in September 2020 while in possession of an Apple iPhone 11 device assigned telephone number (424) 499-7333. Based upon a consent search of that device law enforcement identified Apple IDs peter_mensah100@outlook.com and

boyofash100@outlook.com. The search of the iPhone device also identified that the device as also associated with an active iCloud account, which is further defined below.

92.     In September 2020, in response to a subpoena requesting information pertaining to Apple accounts associated with ABRIELE, DARO, SALAWU and HALVERSON, Apple provided records of the following accounts:

a.   An Apple account is associated with the Apple ID carsonfugie@hotmail.com. The account is listed to Abriele Kosin, 7845 S Candlestick Lane 5305, Midvale, UT 84047, telephone numbers 208-520-0715 and 208-523-7697. Apple products registered to this account include an iPod Nano, iPod Touch, iPhone 4, iPhone 4s, iPhone 5s, iPhone 6 and iPhone 8 plus. As of the date of the subpoena production, the account status and type was described an active Apple ID account. The account was created in December 2011.

b.   An Apple account is associated with the Apple ID drogo1498@icloud.com. The account is listed to Trevor Martin, 7845 S Candlesticklane, Midvale, UT 84047 and telephone number 208-716-4539. The Apple account is associated with additional email kosindaro@gmail.com. Apple products registered to this account include an iPhone 6s and iPhone XS. As of the date of the subpoena production, the account status and type was described an active Apple ID account. Based upon the address, telephone number and associated email being utilized by DARO, law enforcement believes Trevor Martin to be an alias for DARO. The account was created in December 2016.

c.    An Apple account is associated with the Apple ID usalawu@yahoo.com. The account is listed to Khaleed Salawu, 4000 Dunwoody Park, Apt 2103, Dunwoody, GA 30338 and telephone number 404-951-9446. The Apple account is associated with additional email usalawu@icloud.com. Apple products registered to this account include an iPad and iPhone 7. As of the date of the subpoena production, the account status and type was described an active Apple ID account. The account was created in January 2013.

d.   An Apple account is associated with the Apple ID uasalawu@icloud.com. The account is listed to Usman Salawu, 4000 Dunwoody Park, Apt 2103, Dunwoody, GA 30338 and telephone number 404-951-9446. Apple products registered to this account include an iPhone XS, iPhone 7 and iPhone 6. As of the date of the subpoena production, the account status and type was described an active Apple ID account. The account was created in February 2015.

e.   An Apple account is associated with the Apple ID asha.halverson@gmail.com. The account is listed to Asha Halverson, 1914 East 9400 South, Sandy, Utah 84093 and

telephone number 801-819-5888. Apple products registered to this account include an iPad, iPod Nano, iPhone 5C, iPhone 6, iPhone 6s, iPhone 7 and iPhone XS. As of the date of the subpoena production, the account status and type was described an active Apple ID account. The account was created in March 2012.

93. Information connected to an Apple ID may lead to the discovery of additional evidence. For example, the identification of apps downloaded from App Store and iTunes Store may reveal services used in furtherance of the crimes under investigation or services used to communicate with co-conspirators. An example of this would be a list of additional banking or financial transfer applications such as Zelle and Cash App which have already been identified as being utilized to launder fraud proceeds amongst the co-conspirators. The identification of additional banking institutions and accounts may lead to evidence of additional fraud victims, fraud schemes, money laundering activity and use of fraud proceeds.

94. The identification of electronic messaging apps, such as WhatsApp, may reveal services co-conspirators utilize to conceal their identities and communicate about their criminal activities. The investigation has revealed that the criminals conducting the various romance scams often utilize electronic messaging apps and non-traditional service providers, such as Onvoy, TextNow and Pinger, to communicate directly with their victims and conceal their identities. The identification of those applications may lead to the identification of those individuals directly responsible for defrauding victims in the various romance frauds.

95. In my training and experience, individuals engaged in wire fraud and money laundering often utilize various means of electronic communication including email communication and other forms of electronic messaging, to organize or otherwise facilitate their criminal activity. Based upon the large volume of fraudulent transactions and that the co-conspirators have identified addresses across various geographical locations within the United

30

States, law enforcement believes that the co-conspirators facilitate their criminal activity via electronic messaging and banking and/or financial transfer applications utilizing their Apple devices and services facilitated through their Apple ID.

## TELEPHONE ANAYLSIS

96.     To date law enforcement obtained telephone service provider subscriber information and call detail records for telephone numbers associated with ABRIELE, DARO, SALAWU to date.

97.     A review of call detail records in the timeframe of March 2019 through September 2020 for telephone number (208)716-4539, associated with DARO and Apple ID drogo1498@icloud.com revealed two communications with telephone number (208) 389-8414 associated with ADEBAYO. A further review of (208)716-4539 records in that same timeframe also revealed in excess of seven thousand communications, to include in excess of two thousand SMS communications, with telephone number (208)520-0715 associated with ABRIELE and Apple ID carsonfugie@hotmail.com. The review also revealed five communications, to include two SMS communications with telephone number (801)819-2034, associated with HALVERSON.

98.     A review of call detail records in the timeframe of January 2019 until July 2020 for telephone number (404) 951-9446, associated with SALAWU and Apple IDs usalawu@yahoo.com and uasalawu@icloud.com revealed ten communications with telephone number (208) 389-8414 associated with ADEBAYO. A further review of (404) 951-9446 records in that same timeframe revealed forty-nine communications with telephone number (424) 499-7333, also associated with ADEBAYO.

99.     A review of records for telephone number (208)716-4539, associated with DARO and Apple ID drogo1498@icloud.com and telephone number (404) 951-9446, associated with

31

SALAWU and Apple IDs usalawu@yahoo.com and uasalawu@icloud.com revealed common-caller telephone numbers (470)364-2082 and (310) 467-2441 in addition to a phone number associated with ADEBAYO.

100.    Based on the foregoing, I submit there exists probable cause to believe that ABRIELE, DARO, ADEBAYO, AYODELE, SALAWU and HALVERSON utilized electronic communication accounts to facilitate a criminal conspiracy in which fraud proceeds were distributed and laundered amongst co-conspirator accounts prior to being withdrawn and/or utilized by co-conspirators, in violation of Title 18 United States Code Sections 371 (conspiracy), 1343 (wire fraud) and 1956 (money laundering).

101.    Further, based on the fact that ABRIELE, DARO, SALAWU, ADEBAYO and HALVERSON each have active Apple ID accounts and active iCloud accounts, I submit there is probable cause to believe that their respective Apple accounts contain evidence, instrumentalities, and/or fruits of their criminal activity, as further described in Attachment B. ABRIELE, DARO, SALAWU and HALVERSON's Apple ID accounts were created prior to the currently identified criminal activities and have remained active throughout the identified criminal activities. ADEBAYO's Apple ID account was identified based upon a law enforcement search of his iPhone device in September 2020 pursuant to an investigation in which he was charged for various financial crimes in the state of Indiana. Any records of communications among ABRIELE, DARO, SALAWU, HALVERSON and ADEBAYO would be relevant to establish the nature of their respective relationships as well as their respective participation in the above-described money laundering and fraud scheme.

## PRESERVATION REQUEST

102.     The FBI submitted preservation requests to PROVIDER on September 22, 2020, September 23, 2020 and October 14, 2020. In general, an email that is sent to an email provider subscriber is stored in the subscriber's "mail box" on email provider servers until the subscriber deletes the email.  If the subscriber does not delete the message, the message can remain on email provider servers indefinitely. Even if the subscriber deletes the email, it may continue to be available on email provider's servers for a certain period of time.

## INFORMATION REGARDING APPLE ID AND iCLOUD[4]

103.     Apple is a United States company that produces the iPhone, iPad, and iPod Touch, all of which use the iOS operating system, and desktop and laptop computers based on the Mac OS operating system.

104.     Apple provides a variety of services that can be accessed from Apple devices or, in some cases, other devices via web browsers or mobile and desktop applications ("apps").   As described in further detail below, the services include email, instant messaging, and file storage:

a.     Apple provides email service to its users through email addresses at the domain names mac.com, me.com, and icloud.com.

b.     iMessage and FaceTime allow users of Apple devices to communicate in real-time.  iMessage enables users of Apple devices to exchange instant messages ("iMessages")

---

[4]     The information in this section is based on information published by Apple on its website, including, but not limited to, the following document and webpages: "U.S. Law Enforcement Legal Process Guidelines," available at http://images.apple.com/privacy/docs/legal-process-guidelines-us.pdf; "Create and start using an Apple ID," available at https://support.apple.com/en-us/HT203993; "iCloud," available at http://www.apple.com/icloud/; "What does iCloud back up?," available at https://support.apple.com/kb/PH12519; "iOS Security," available at https://www.apple.com/business/docs/iOS_Security_Guide.pdf, and "iCloud: How Can I Use iCloud?," available at https://support.apple.com/kb/PH26502.

containing text, photos, videos, locations, and contacts, while FaceTime enables those users to conduct video calls.

c.       iCloud is a file hosting, storage, and sharing service provided by Apple. iCloud can be utilized through numerous iCloud-connected services, and can also be used to store iOS device backups and data associated with third-party apps.

d.       iCloud-connected services allow users to create, store, access, share, and synchronize data on Apple devices or via icloud.com on any Internet-connected device.  For example, iCloud Mail enables a user to access Apple-provided email accounts on multiple Apple devices and on icloud.com.  iCloud Photo Library and My Photo Stream can be used to store and manage images and videos taken from Apple devices, and iCloud Photo Sharing allows the user to share those images and videos with other Apple subscribers.  iCloud Drive can be used to store presentations, spreadsheets, and other documents.  iCloud Tabs and bookmarks enable iCloud to be used to synchronize bookmarks and webpages opened in the Safari web browsers on all of the user's Apple devices.  iWork Apps, a suite of productivity apps (Pages, Numbers, Keynote, and Notes), enables iCloud to be used to create, store, and share documents, spreadsheets, and presentations.  iCloud Keychain enables a user to keep website username and passwords, credit card information, and Wi-Fi network information synchronized across multiple Apple devices.

e.       Game Center, Apple's social gaming network, allows users of Apple devices to play and share games with each other.

f.       Find My iPhone allows owners of Apple devices to remotely identify and track the location of, display a message on, and wipe the contents of those devices.  Find My Friends allows owners of Apple devices to share locations.

34

g.      Location Services allows apps and websites to use information from cellular, Wi-Fi, Global Positioning System ("GPS") networks, and Bluetooth, to determine a user's approximate location.

h.      App Store and iTunes Store are used to purchase and download digital content.  iOS apps can be purchased and downloaded through App Store on iOS devices, or through iTunes Store on desktop and laptop computers running either Microsoft Windows or Mac OS.  Additional digital content, including music, movies, and television shows, can be purchased through iTunes Store on iOS devices and on desktop and laptop computers running either Microsoft Windows or Mac OS.

105.    Apple services are accessed through the use of an "Apple ID," an account created during the setup of an Apple device or through the iTunes or iCloud services.  A single Apple ID can be linked to multiple Apple services and devices, serving as a central authentication and syncing mechanism.

106.    An Apple ID takes the form of the full email address submitted by the user to create the account; it can later be changed.  Users can submit an Apple-provided email address (often ending in @icloud.com, @me.com, or @mac.com) or an email address associated with a third-party email provider (such as Gmail, Yahoo, or Hotmail).  The Apple ID can be used to access most Apple services (including iCloud, iMessage, and FaceTime) only after the user accesses and responds to a "verification email" sent by Apple to that "primary" email address.  Additional email addresses ("alternate," "rescue," and "notification" email addresses) can also be associated with an Apple ID by the user.

107.     Apple captures information associated with the creation and use of an Apple ID. During the creation of an Apple ID, the user must provide basic personal information including the user's full name, physical address, and telephone numbers.  The user may also provide means of payment for products offered by Apple.  The subscriber information and password associated with an Apple ID can be changed by the user through the "My Apple ID" and "iForgot" pages on Apple's website.  In addition, Apple captures the date on which the account was created, the length of service, records of log-in times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to and utilize the account, the Internet Protocol address ("IP address") used to register and access the account, and other log files that reflect usage of the account.

108.     Additional information is captured by Apple in connection with the use of an Apple ID to access certain services.  For example, Apple maintains connection logs with IP addresses that reflect a user's sign-on activity for Apple services such as iTunes Store and App Store, iCloud, Game Center, and the My Apple ID and iForgot pages on Apple's website.  Apple also maintains records reflecting a user's app purchases from App Store and iTunes Store, "call invitation logs" for FaceTime calls, "query logs" for iMessage, and "mail logs" for activity over an Apple-provided email account.  Records relating to the use of the Find My iPhone service, including connection logs and requests to remotely lock or erase a device, are also maintained by Apple.

109.     Apple also maintains information about the devices associated with an Apple ID. When a user activates or upgrades an iOS device, Apple captures and retains the user's IP address and identifiers such as the Integrated Circuit Card ID number ("ICCID"), which is the serial

number of the device's SIM card.  Similarly, the telephone number of a user's iPhone is linked to an Apple ID when the user signs in to FaceTime or iMessage.  Apple also may maintain records of other device identifiers, including the Media Access Control address ("MAC address"), the unique device identifier ("UDID"), and the serial number.  In addition, information about a user's computer is captured when iTunes is used on that computer to play content associated with an Apple ID, and information about a user's web browser may be captured when used to access services through icloud.com and apple.com.  Apple also retains records related to communications between users and Apple customer service, including communications regarding a particular Apple device or service, and the repair history for a device.

110.    Apple provides users with five gigabytes of free electronic space on iCloud, and users can purchase additional storage space.  That storage space, located on servers controlled by Apple, may contain data associated with the use of iCloud-connected services, including: email (iCloud Mail); images and videos (iCloud Photo Library, My Photo Stream, and iCloud Photo Sharing); documents, spreadsheets, presentations, and other files (iWork and iCloud Drive); and web browser settings and Wi-Fi network information (iCloud Tabs and iCloud Keychain).  iCloud can also be used to store iOS device backups, which can contain a user's photos and videos, iMessages, Short Message Service ("SMS") and Multimedia Messaging Service ("MMS") messages, voicemail messages, call history, contacts, calendar events, reminders, notes, app data and settings, Apple Watch backups, and other data.  Records and data associated with third-party apps may also be stored on iCloud; for example, the iOS app for WhatsApp, an instant messaging service, can be configured to regularly back up a user's instant messages on iCloud Drive.  Some of this data is stored on Apple's servers in an encrypted form but can nonetheless be decrypted by Apple.

111.    In my training and experience, evidence of who was using an Apple ID and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above.  This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

112.    For example, the stored communications and files connected to an Apple ID may provide direct evidence of the offenses under investigation.  Based on my training and experience, instant messages, emails, voicemails, photos, videos, and documents are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation.

113.    In addition, the user's account activity, logs, stored electronic communications, and other data retained by Apple can indicate who has used or controlled the account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, subscriber information, email and messaging logs, documents, and photos and videos (and the data associated with the foregoing, such as geo-location, date and time) may be evidence of who used or controlled the account at a relevant time.  As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account.  Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

114.     Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation.  For example, information on the account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

115.     Other information connected to an Apple ID may lead to the discovery of additional evidence.  For example, the identification of apps downloaded from App Store and iTunes Store may reveal services or financial institutions used in furtherance of the crimes under investigation or services used to communicate with co-conspirators.  In addition, emails, instant messages, Internet activity, documents, and contact and calendar information can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

116.     Therefore, Apple's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Apple's services.  In my training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

117.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Apple to disclose to the government copies of the records and other information (including the content of communications and stored data) particularly described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B,

government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## **CONCLUSION**

118.　Based on the forgoing, I submit that this affidavit supports probable cause for a warrant to search items described in Attachment A to seize the items described in Attachment B. Therefore, I request that the Court issue the proposed search warrant. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

119.　The government will execute this warrant by serving the warrant on Apple. Because the warrant will be served on Apple, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

## REQUEST FOR RESTRICTION, NON-DISCLOSURE TO SUBSCRIBERS AND REQUEST TO KEEP ACCOUNTS ACTIVE

120.    I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be restricted  until further order of the Court.  These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.  Accordingly, there is good cause to restrict these documents because their premature disclosure may seriously jeopardize that investigation.  Specifically, if the targets prematurely learned of the FBI's investigation, some of them may attempt to destroy, delete or otherwise remove evidence located on various accounts or cloud based storage systems which agents have yet to identify.  Similarly, some of the targets may attempt to obstruct justice and intimate witnesses by influencing such witnesses to not cooperate with federal agents should the investigation be revealed at this time.  Finally, some targets may also attempt to flee the United States to their home countries in the event this affidavit and connected search warrant were made public at this time.

121.    I am also aware that Apple will routinely disclose to their customers and subscribers that law enforcement has requested a search warrant for a respective account.  Therefore, I am requesting that the Court order that Apple not disclosure the existence of this affidavit and warrant to its customers and subscribers connected to the Apple accounts sought.

122.    Lastly, I am aware that Apple will sometimes shut down accounts that are the subject of ongoing investigations once they receive warrants, court orders, or subpoenas.  Even without disclosing the nature of the investigative process that it has received, if Apple takes such action, it will alert the targets that an investigation is ongoing.  This could result in the same

41

consequences as outlined above.  So as not to alert the targets of the ongoing investigation, I am

requesting that the Court order that the Apple not shut down the accounts in issue or otherwise

take any adverse action against such accounts.


I declare under penalty of perjury that the foregoing is true and correct to the best of my

information, knowledge, and belief.

Respectfully submitted,

*s/John P. McGrath*

John P. McGrath
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on _____October 21_____, 2020


HON. MICHAEL E. HEGARTY
UNITED STATES MAGISTRATE JUDGE


Application for search warrant was reviewed and is submitted by Tim R. Neff, Assistant United

States Attorney.